UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Wynton Stewart,

    *Plaintiff*,

v.

Jose Ferral,

    *Defendant*.

No. 24 CV 9999

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Wynton Stewart was injured in a prison brawl at the Cook County Department of Corrections ("CCDOC"). Arguing that his injuries were preventable had Officer Jose Ferral called in the fight sooner, he now files this 42 U.S.C. § 1983 action *pro se*, claiming that Ferral failed to protect him from violence. He also raises a claim for excessive force, arguing that he was unreasonably choked when Ferral restrained him after Stewart took a swing at another detainee in Ferral's custody. Ferral has moved for summary judgment on both claims, and the court grants the motion in full.

## I.    Background

The court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed except where otherwise noted.[1] [Dkts. 42, 56.] The court views the record in the light most favorable to Stewart. See *Frazier-Hill v. Chi. Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023).

Plaintiff Stewart is a pretrial detainee at the CCDOC. [Dkt. 42, ¶ 1; Dkt. 42-3.] On July 29, 2024, Stewart was injured in a detainee-on-detainee fight that he says "escalated into mob action," and which resulted in him receiving medical treatment. [Dkt. 42, ¶¶ 6–9.] The abridged, high-level version of events is this: Stewart joined what had evolved into a multi-detainee brawl—he says to break it up—and was stabbed in his back and head. [*Id.*, ¶ 10.] Defendant Ferral, the correctional officer at the scene, did not immediately radio for backup. [*Id.*, ¶ 38.] After he did, and as things

---

[1]    "On summary judgment, the court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires the moving party to file a statement of material facts with citations to specific supporting evidence in the record. L.R. 56.1(a)(2); *see also* L.R. 56.1(d). The opposing party must then respond to each fact by either admitting it or disputing it with its own supporting evidence. L.R. 56.1(b)(2); *see also* L.R. 56.1(e). A fact may be deemed admitted when the opposing party fails to respond or controvert it with citations to the evidence. *See* L.R. 56.1(e)(3).

settled, Ferral was leading a different, handcuffed detainee toward the exit when Stewart threw a punch. [*Id.*, ¶ 41.] Ferral then restrained Stewart, and, in doing so, made contact with Stewart's neck—the extent of which is in dispute. [*Id.*, ¶¶ 42–43.]

More precisely, video footage unambiguously shows the following:[2]

At 8:32:00,[3] a fight spilled into tier 2-A of Division 9 of the CCDOC. [Dkt. 46, at Ex. I; Dkt. 42, ¶ 6.] At the time, Stewart was uninvolved, standing away from the action with his arms crossed. [Dkt. 46, at Ex. I.] Ferral had not yet entered the tier and was instead in an adjoining vestibule with a different detainee. [*See* Dkt. 51, at Ex. 1.] Punches were visible through a tinted glass window, but Ferral, who was speaking with the detainee, did not immediately notice. [*Id.*]

At 8:32:09, Ferral began walking toward the vestibule window and, after observing the fighting, entered the tier. [*Id.* (8:32:20); Dkt. 42, ¶ 57.] The altercation paused, and Stewart sat down at a table. [Dkt. 46, at Ex. I.] It resumed soon after, and those involved—including detainee Stephen Davis—were quickly separated by other detainees. [*Id.* (8:32:34).]

Ferral then walked through the tier toward Davis, and, at 8:33:00, Stewart stood and navigated the crowd, directly passing Ferral. [Dkt. 46, at Ex. I, J.] The two didn't face each other. [*Id.*] Ferral began escorting Davis to a cell, but as he opened the cell door, Davis wandered off and again began fighting another detainee. [Dkt. 42, ¶ 37; Dkt. 46, at Ex. J (8:33:33).] Ferral tried briefly to separate them but then stepped away to close the open cell door, at which point the altercation escalated into a brawl. [Dkt. 42, ¶ 36; Dkt. 46, at Ex. J.] Stewart then moved toward the fighting, eventually entering the pile. [*Id.* (8:33:40).]

At 8:33:45, Ferral radioed for backup while walking away from the brawl and exiting the tier. [Dkt. 42, ¶ 38; 46, at Ex. J.] Meanwhile, Stewart fought off several detainees for approximately 25 seconds. [*Id.*; Dkt. 42, ¶ 63 (8:33:50–8:34:15).]

Ferral returned with backup at 8:34:25 to break up the fighting. [*Id.*, ¶ 64; Dkt. 46, at Ex. I.] Stewart and others then lined up along the tier's perimeter as, one by one, the officers escorted participants out—among them, a detainee named Serrano. [*Id.*, ¶¶ 64, 65; Dkt. 46, at Ex. I.]

---

[2]     At summary judgment, video evidence can resolve a factual dispute only where "there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023); *Mendez v. City of Chicago*, 160 F.4th 888, 892 (7th Cir. 2025) (noting that videos that are "unclear, incomplete, and fairly open to varying interpretations cannot resolve evidentiary matters short of trial").

[3]     All times are approximate.

Events key to this lawsuit happened next. As Ferral walked Serrano past Stewart, Stewart stepped from line and swung at Serrano, who ducked to escape the blow. [Dkt. 42, ¶ 64; Dkt. 46, at Ex. I (8:35:35).] The parties dispute whether Stewart's fist made contact with Ferral's chest, but footage shows he at least came close. [*Id.*; *see*, Dkt 56, ¶ 66.]

His right hand still holding Serrano, Ferral immediately grabbed Stewart with his left hand and attempted to pin him against a wall. [Dkt. 42, ¶ 67; Dkt. 46, at Ex. I.] Three seconds later, Ferral released Serrano, at which point Ferral's right hand moved toward Stewart's neck. [Dkt. 42, ¶ 68; Dkt. 46, at Ex. I (8:35:38).] Ferral and another officer then pushed Stewart into the vestibule where a different camera captured the relevant events. [Dkt. 42, ¶ 69; Dkt. 46, at Ex. I (8:35:42).] Within six seconds, Ferral's left hand was no longer touching Stewart, who at that point was being physically restrained by multiple officers. [Dkt. 42, ¶ 70; Dkt. 46, at Ex. K (8:35:44).] By 8:35:49, Ferral had ceased all contact with Stewart. [Dkt. 42, ¶ 71; Dkt. 46, at Ex. K (8:35:49).]

Footage is inconclusive as to how long Ferral was in contact with Stewart's neck, and whether he ever touched it with both hands. At most, the footage shows Ferral with one hand near Stewart's neck for nine seconds (8:35:35–8:35:44), and two hands near his neck for six seconds (8:35:38–8:35:44). Stewart does not seem to challenge that, for the first three seconds of contact, Ferral grabs him closer to the shoulder, and so the court considers the two-hands, six-seconds timeline for the purposes of summary judgment. [*See* Dkt. 56, ¶ 67.] This is consistent with what Stewart admits. [*Id.*, ¶ 73.]

Stewart was medically evaluated after the incident. [Dkt. 42, ¶ 25.] Per the evaluation:

> [Patient] involved in an altercation - [patient] has a small superficial scratch on back of scalp -[patient] states was stabbed by detainee on tier - area cleansed with normal saline) no active bleeding noted. [patient] requesting an xray on right hand - middle finger with very little swelling. movement envelope given to doc to escort [patient] to [urgent care] for further eval.

[Dkt. 42-6, at 1.[4]] The urgent care examination, meanwhile, reported "superficial abrasions to face and extremities" and "multiple contusions to entire scalp," including "1 cm superficial stab wound at Left occiput without active bleeding." As to his neck, it observed: "[s]upple, trachea midline, no tenderness, no JVD." [*Id.*, at 6.]

Stewart also filed two grievances against Ferral, alleging (1) failure to protect, and (2) excessive force. [Dkt. 42, ¶¶ 15, 20.] For each, Stewart received a response

---

[4]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

stating that his grievances "cannot [be] substantiate[d] or den[ied]," but were forwarded to the Office of Professional Review. [Dkt. 42-4, at 4; Dkt. 42-5, at 4.] He appealed and was notified in both instances that the original response would stand. [Dkt. 42, ¶¶ 18, 23.]

Attached to the 'excessive force' response, though, a review form noted that the "Officer will be sent for training." [*Id.*, ¶ 24.] This included use of force training with "special attention to neck consideration" and "having a discussion on making timely notifications and the method of response in these types of situations." [*Id.*, ¶ 46.] Still, the incident report observed that "after reviewing all material accessible … the force used was in accordance with CCSO policy and procedures." [Dkt. 42-8, at 14.[5]]

His appeals otherwise denied, Stewart now sues, again alleging (1) failure to protect and (2) excessive force.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The court construes the evidence in the light most favorable to the non-moving party, giving him the benefit of all reasonable inferences. *Lesiv v. Illinois Central Railroad Co.*, 39 F.4th 903, 911 (7th Cir. 2022). Defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

## III. Analysis

Ferral has moved for summary judgment on both claims, arguing (1) that Stewart fails to sufficiently establish a particular risk or causation, as is necessary to sustain his failure-to-protect claim, (2) that based on Stewart's facts and clear video footage, the use of force was objectively reasonable, and (3) that, regardless, he is entitled to qualified immunity for both. [Dkt. 43.] The court agrees.

### A. Failure to Protect

Stewart's failure-to-protect theory is, in a nutshell, that Ferral failed to immediately call in backup during the initial altercation, leading to Stewart's eventual injury when the fight escalated into a brawl. [*See* Dkt. 7, at 6; Dkt. 55, at 4.]

---

[5]    Stewart disputes that it was in accordance with procedure, *see* Dkt. 56, ¶ 45, but that does not change that the Incident Report concluded otherwise. [Dkt. 42-8, at 14.]

"[T]o state a viable failure-to-protect claim under the Fourteenth Amendment, a pretrial detainee must allege: (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries." *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (citing *Kemp v. Fulton County*, 27 F.4th 491, 496 (7th Cir. 2022)).

Ferral's arguments for summary judgment are twofold: first, that the risk Stewart identifies is a "general risk of violence between detainees," rather than one "specific to the plaintiff," and second, that Stewart's injuries were de minimis and not caused by Ferral's (in)actions. [Dkt. 43, at 4–6.]

First, the court agrees that Stewart has identified only a general risk, which is insufficient to survive summary judgment. The Seventh Circuit has held that—whether because of the identities of the victim and/or attacker, a victim's particular vulnerability, or an attacker's predatory nature—"the risk must be somehow 'specific to a detainee, and not a mere general risk of violence.'" *Thomas*, 39 F.4th at 842–43 (7th Cir. 2022) (quoting *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005)). Indeed, "the 'general risks of violence in prison' confront virtually every detainee." *Id.* at 843 (citing *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000)).

Stewart's opposition brief appears, at times, to concede that the risk was not particular. In describing Ferral's actions, he says Ferral "is aware of the transpiring incident and did not call [for backup] over the radio[,] neglecting to do his job and deliberately putting *all detainees at risk of harm and injuries.*" [Dkt 55, at 1 (emphasis added).] He also argues that "this all derived out of Defendant failing to protect Plaintiff *and all others involved.*" [*Id.*, at 3 (emphasis added).]

Footage of the incident shows the same: a brawl—in which Stewart, who fights for just 25 seconds, is not the immediate target—carrying risk to anyone involved. [*See* Dkt. 46, at J.]

Stewart, perhaps realizing the flaw in arguing that "all detainees [were] at risk," attempts a pivot. [Dkt. 55, at 1.] He alleges—also in his opposition brief, and for the first time—that "Ferral asked [him] to assist in breaking up the massive incident," which put him at particular risk. [*Id.*] This factual theory appears neither in his grievances nor his pleadings, and it therefore amounts to an inappropriate attempt to amend his complaint through summary judgment briefing. *See Schmees*

5

*v. HC1.COM, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023).[6] The court will not permit him to do so. *Id.* (finding it within district court's "discretion to treat new claims presented for the first time in briefing as a constructive motion to amend," and observing it is "rarely [] appropriate to do so").

Even if it did, no reasonable jury would find the theory supported by the evidence. Stewart cites Ferral's statement of facts as support, *see* Dkt. 55, at 2 (citing Dkt. 42, ¶ 58), but Ferral says only that, for "approximately one minute," he tried to "de-escalate by speaking with *the detainees* on the tier." [Dkt. 42, ¶ 58 (emphasis added).]

Nor does the video footage show what Stewart says it shows. Stewart says that Ferral requested his help at 8:33:15, but at that moment, Ferral is walking Davis to a cell and is neither near nor facing Stewart. [*See* Dkt. 46, at Ex. J.] At 8:33:00, Stewart *does* walk directly alongside Ferral, but they never look at each other. [*Id.*] Moreover, the notion that Ferral asked Stewart to help "defuse the brawl," is belied by the fact that, at either moment, no fighting—much less a brawl—was underway. At that point, fighting had been episodic and isolated, and the brawl began afterward.

Regardless, the factual theory is absent from Stewart's complaint and he cannot rely on it now. What he's otherwise alleged, and what the footage clearly establishes, is a mere general risk of violence. More is needed, and so Stewart's failure-to-protect claim fails as a matter of law.

Next, Ferral argues that Stewart cannot establish that Ferral caused his injuries, which were de minimis. Though the court is not prepared to accept at summary judgment that "multiple contusions to [the] entire scalp" and a stab wound to the skull—superficial or not—are necessarily de minimis, it does agree that Stewart cannot establish causation, i.e., the fourth element of a failure-to-protect claim. [Dkt. 43-6, at 6.]

---

[6]     "When a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). The latter is generally permissible. *Schmees*, 77 F.4th at 489. To characterize what Stewart attempts here, the court finds it helpful to "ask if the plaintiff's new theory of relief is supported by the factual allegations in the complaint. If it isn't, then the plaintiff is changing the factual basis of his claim." *Ollison v. Gossett*, 136 F.4th 729, 744 (7th Cir. 2025) (Kirsch, J. concurring). *See also Marski v. Courier Express One, Inc.*, 2021 WL 4459512, at *14 (N.D. Ill. Sept. 29, 2021) ("courts should allow a new claim to proceed if the claim merely adds a new legal theory based on facts already found within the complaint"). Here, the allegation that Ferral requested Stewart's assistance is not a theory that draws on existing facts, but rather itself a fact entirely absent from the complaint.

Though causation in § 1983 cases if "typically a question best left for the jury," there are cases where proximate causation may be decided as a matter of law." *Hunter v. Mueske*, 73 F.4th 561, 568 (7th Cir. 2023). So it is here. "Under the doctrine of proximate causation, a defendant is liable only for those harms she foreseeably risked by her wrongful actions." *Id.* And the Seventh Circuit has observed that an inmate's "deliberate choice to approach [another] was an unforeseeable superseding cause of his injury that severs [] liability." *Id.*, at 569. Indeed, in *Hunter*, the Seventh Circuit endorsed the Eleventh Circuit's decision in *Buckman v. Halsey*, 2021 WL 4127067 (11th Cir. Sept. 10, 2021), where it "rejected the [failure-to-protect] claim, concluding that the guard's failure to protect the plaintiff from the other inmate was not the proximate cause of the plaintiff's injury, because the plaintiff himself had started the fight, even though he safely could have avoided the other inmate altogether." *Hunter*, 73 F.4th at 569 (emphasizing also that the plaintiff "initiated [the] interaction … even though it is not clear who started the physical fight").

Here, Stewart does not deny that he "join[ed] the brawl along with many others," or that "[t]here are several individuals … who never join in on any fighting throughout the course of the entire altercation." [Dkt. 42, ¶¶ 60, 62; Dkt. 56 (not denying either allegation).] His complaint and answers to interrogatories make clear that he "tried to break up the fight." [Dkt. 7, at 6; Dkt. 42-9, ¶¶ 5, 6.] And in his post-incident interview, he says that he "jumped in, just trying to break it up." [*See* Dkt. 51, at Ex. 2.] The footage shows the same, with Stewart moving toward the altercation after previously avoiding it. [Dkt. 46, at Ex. J (8:33:33).] He is not a targeted victim, trapped or otherwise pursued, but ends up fighting with those also pulled into the brawl. [*Id.* (8:33:47).] Though Stewart did not initiate the interaction, the footage and his admissions make clear that he, like the plaintiffs in *Hunter* and *Buckman*, made a "deliberate choice to approach" even though he "could have avoided the [altercation] altogether," as did others on the tier. *Hunter*, 73 F.4th at 569. His mere presence on the tier does not render his involvement foreseeable, particularly given his lack of involvement during the period he insists Ferral should have radioed for backup.

For this reason, too, Ferral is entitled to summary judgment on the failure-to-protect claim.

## B. Excessive Force

Following the brawl, and as he was escorting Serrano, Ferral physically restrained Stewart after Stewart attempted to punch Serrano. Stewart says Ferral choked him, and so he sues for excessive force. [*See* Dkt. 7, at 6; Dkt. 55, at 1–2.] To prevail on a claim of excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). And because Ferral raises the affirmative defense of qualified immunity, Stewart has the burden of defeating it at summary judgment. *Mabes v. Thompson*, 136 F.4th 697, 705 (7th Cir. 2025).

7

### 1.    Objective Reasonableness

Excessive force cases are poor candidates for summary judgment, since "issues of fact about what took place" often abound. *Harris v. Ealey*, 2021 WL 5823513, at *4 (N.D. Ill. Dec. 8, 2021) (citing *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010). But "[w]hether a particular use of force was objectively reasonable is a legal determination rather than a pure question of fact for the jury to decide." *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (internal citation and quotation marks omitted).

Here, factual questions remain as to how long Ferral was in contact with Stewart's neck, and whether he ever grabbed it with both hands simultaneously. Summary judgment is therefore appropriate only if, viewing the circumstances in the light most favorable to Stewart, no reasonable jury could find the use of force excessive.

Objective reasonableness is determined "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. Courts must defer to "policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 389 (cleaned up). Relevant considerations include: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397.

There is no dispute that Ferral used force only after Stewart swung toward him, regardless of whether Stewart was aiming at or made contact with Ferral. Moreover, Ferral's conduct is contextualized not only by Stewart swinging in his direction (or at Serrano), but also by the multi-detainee brawl that officers were in the process of clearing. The punch—or, as Stewart calls it, "his failed attempt at subjective justice"—risked reigniting the on-and-off fighting that had finally ceased. [Dkt. 55, at 3.] Footage shows that Ferral reacted within a split second of Stewart's punch. [Dkt. 46, at Ex. I (8:35:35).] Given the physical threat to either Ferral or Serrano, as well as the underlying security concerns—which, as Stewart himself admits, required multi-officer intervention—some degree of force was certainly reasonable.

Meanwhile, Stewart's claim that he was in "full submission," and that he showed no "signs of threat or potential threat to Defendant or anyone at that time," contradicts the clear video evidence. [Dkt. 55, at 3.] For one, the brief use of force cannot be entirely divorced from that initial attempt at "subjective justice," and Ferral engaged—without pause—only after Stewart initiated contact. For another, even after being restrained, Stewart continues to push against the officers for the full

fourteen seconds that Ferral is involved. Footage also shows him swiping, or at least extending an arm, at 8:35:44. [Dkt. 46, at Ex. K.]

Finally, Stewart says he was injured, but any argument—as well as his declaration of a sore neck in his answers to interrogatories, *see* Dkt. 56, ¶ 49—is qualified by the post-incident medical examination. And though Stewart cites for support the fact that the urgent care examiner "describe[d] the condition of [his] neck," *id.*, ¶ 50, the report *actually* described his neck as "[s]upple, trachea midline, no tenderness, no JVD." [Dkt. 42-6, at 6.] In other words, normal.

So, again, some measure of force was reasonable. The question is whether, from what is either undisputed or otherwise clear from the footage, Ferral's behavior exceeds that.

Ultimately, then, the court must decide whether a six-second, two-hand choke—which at most caused neck soreness that went un-observed by a third party medical examiner—was objectively reasonable given: (1) that Stewart initiated by swinging in Ferral's direction, (2) that he swung at Serrano, risking reigniting tensions in the aftermath of a multi-detainee brawl, and (3) that Stewart never clearly submits until after Ferral has disengaged. Given these circumstances, the court concludes that a reasonable officer would not find this use of force objectively unreasonable.

True, after the incident, the Use of Force Review Unit recommended Ferral for supplemental training, specifically "with special attention to neck consideration." [Dkt. 42, ¶ 46.] But there's daylight between objectively unreasonable and merely imperfect applications of force. *See Harris*, 2021 WL 5823513, at *5 ("An officer is not required to use the least amount of force possible to restrain an inmate. Rather, the force must be reasonable under the circumstances.") And to be sure, despite the recommendation, the reviewers concluded that "the force used was in accordance with CCSO policy and procedures." [Dkt. 42-8, at 14.]

Summary judgment against Stewart is therefore warranted on his excessive force claim, too.

### 2.    Qualified Immunity

Even if Ferral's use of force was objectively unreasonable, qualified immunity would nevertheless entitle him to summary judgment. The defense provides public officials "immunity from suit unless [they] violated a clearly established constitutional right," and in the case of excessive force claims, "gives 'enhanced deference to officers' on-scene judgments about the level of necessary force'" *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (*Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013)).

9

The two-step qualified immunity inquiry asks "(1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* (also observing that the "order of inquiry is not rigid; we may address the second question first if it simplifies the analysis"). Once the defense raised, the plaintiff bears the burden of defeating it. *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). To do so, "the plaintiff must demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'" *Dockery*, 911 F.3d at 466 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). It is not enough to allege a "violation of extremely abstract rights," or to define the "constitutional right in question at a 'high level of generality.'" *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "[T]he precedent must be 'particularized to the facts of the case,'" *id.* (quoting *White*, 580 U.S. at 79), or else the conduct must be "so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24.

Stewart's response to Ferral's invocation of qualified immunity is barebones and suffers from nearly all of these defects. He argues only that "Defendant should not be qualified for Immunity when Defendant openly admits that his action of (choking) excessive force was intentional," and reasons that "[w]hen a Defendant claims they intentionally choked someone that's them saying forget your constitutional rights period." [Dkt. 55, at 2, 6.] For one, though Stewart cites to Ferral's brief as clear evidence of intent, the brief says only that "*even if* Plaintiff was truly and intentionally 'choked' as a means to subdue him…" [Dkt. 43, at 10 (emphasis added).] It's a hypothetical, where intent is assumed for the sake of anticipating Stewart's arguments. The premise of Stewart's argument is thus flawed.

Meanwhile, he cites no caselaw and asserts only the most abstract and general of constitutional rights: a violation of his "constitutional rights period." [Dkt. 55, at 6.] Perhaps in emphasizing Ferral's intent, Stewart sought to establish conduct that was "so egregious and unreasonable" that analogous precedent is unnecessary. But again, that premise is flawed and, in any event, intent is irrelevant to the inquiry. *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

It is Stewart's burden to defeat qualified immunity, and his failure to respond meaningfully to the defense entitles to Ferral to summary judgment. *See Thomas v. Carmichael*, 164 F.4th 1058, 1066 (7th Cir. 2026) (affirming decision that "by failing to address qualified immunity, [plaintiff] necessarily failed to meet his burden of

defeating it").[7] Therefore, regardless of whether questions of fact exist as to the underlying force, the claim cannot survive.

## IV.     Conclusion

For these reasons, Ferral's motion for summary judgment is granted.

Enter: 24-cv-9999
Date:   April 1, 2026

_____
Lindsay C. Jenkins

---

[7]     Ferral also raised qualified immunity as an affirmative defense to the failure-to-protect claim. Stewart ignores this entirely, so Ferral would be entitled to summary judgment on the claim for this reason, too.

11